20-mj-668 TNL

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT

I, **Thomas E. Wilberg,** being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Special Agent of the Federal Bureau of Investigation ("FBI"). I have been employed by the FBI since January of 2010. Since June of 2015 I have been assigned to the Joint Terrorism Task Force (the "JTTF") of the FBI's Minneapolis Division. In this capacity, I investigate, among other things, criminal cases relating to domestic terrorism, such as allegations of the provision of weapons of mass destruction. In addition to my on-the-job experience, the FBI has provided me with extensive training in domestic terrorism and the techniques used to investigate allegations of domestic terrorism.

2.      I make this Affidavit in support of an application for a criminal complaint for Michael Robert Solomon, a citizen of the United States, born in March of 1990, residing in New Brighton, Minnesota, and Benjamin Ryan Teeter, a citizen of the United States, born in April of 1998, residing in Hampstead, North Carolina, for violating Title 18, United States Code, § 2339B, Conspiring to Provide and Attempting to Provide Material Support to a Designated Foreign Terrorist Organization ("FTO") and Aiding and Abetting in violation of Title 18, United States Code, § 2.

3.      The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this

1

investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. In this affidavit, the quoted language is from preliminary transcriptions.

## STATUTORY AUTHORITY

4.      Title 18, United States Code, Section 2339B prohibits, in pertinent part, a person from knowingly providing "material support or resources to a foreign terrorist organization," or attempting or conspiring to do the same.

5.      "The term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safe houses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." Title 18, United States Code, Section 2339A(b)(1).

## HAMAS

6.      On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and Nationality Act. On October 31, 2001, the Secretary of State also designated HAMAS as a Specially Designated Global Terrorist under Executive Order 13224. As part of this designation, the Secretary of State listed a number of aliases for HAMAS, including, Izz Al-Din Al-Qassim Brigades, Izz Al-Din Al-Qassim Forces, Izz Al-Din Al Qassim Battalions,

Izz al-Din Al Qassam Brigades, Izz al-Din Al Qassam Forces, and Izz al-Din Al Qassam Battalions. To date, HAMAS remains a designated FTO.

## FACTS ESTABLISHING PROBABLE CAUSE

7.      In late May of 2020, the FBI initiated an investigation into members of the "Boogaloo Bois" based on information that members were discussing committing crimes of violence and were maintaining an armed presence on the streets of Minneapolis during civil unrest following the death of George Floyd. Your affiant knows that the "Boogaloo Bois" are a loosely-connected group of individuals espousing violent anti-government sentiments. The term "Boogaloo" itself references a supposedly impending second civil war in the United States and is associated with violent uprisings against the government. SOLOMON and TEETER claim to be members of the Boogaloo Bois and a sub-group called the "Boojahideen".[1]

8.      Beginning on Tuesday, May 26, 2020,[2] Minneapolis and St. Paul experienced widespread arson, rioting, and looting. This unrest, and the associated damage and destruction, was, in part, a response to the death of George Floyd during an encounter with the Minneapolis Police Department. The civil unrest received nationwide media coverage and was widely discussed across numerous social media platforms.

9.      On May 26, SOLOMON, a United States citizen and resident of Minnesota, publically posted on Facebook the following: "I need a headcount. If you have keybase[3] message

---

[1] The term appears to be borrowed from the term "mujahideen," which your affiant knows to mean those engaged in jihad and is often used to refer to guerrilla fighters in Islamic countries.

[2] Hereinafter, all dates referenced in this affidavit are in the year 2020.

[3] "Keybase" is a secure messaging and file sharing service that utilizes end-to-end encryption.

3

me on there 'bigboogboi' if not pm[4] me". That same day, TEETER, a resident of North Carolina, publically posted the following on Facebook: "Lock and load boys. Boog flags are in the air, and the national network is going off." A review of TEETER's public posts shows that he then travelled from North Carolina to the District of Minnesota.

10.     In late May, FBI agents encountered Witness-1 (W-1) after responding to a tip about the presence of armed men in a residential neighborhood in Minneapolis. W-1 then explained a series of events involving both SOLOMON and TEETER.[5] W-1 told agents that s/he had met SOLOMON during civil unrest taking place in the Twin Cities following the death of George Floyd. According to W-1, s/he met SOLOMON on May 26 as he openly carried a firearm on the street. SOLOMON explained to W-1 that his group, the "Boojahideen", were willing to protect W-1 from the police, white supremacists, and looters during the on-going civil unrest. SOLOMON also told W-1 that his mission was to get the police out of the city.

11.     Approximately three days later, W-1 invited SOLOMON and his associates to stay at W-1's house. Over the next several days, SOLOMON, TEETER, and an associate (INDIVIDUAL 1), stayed overnight at W-1's home and it was during this time that SOLOMON, TEETER, and INDIVIDUAL 1 discussed committing acts of violence against police officers and other targets.     These conversations – combined with SOLOMON's, TEETER's, and INDIVIDUAL 1's possession of firearms and substantial quantities of ammunition – caused W-1 to become uncomfortable with their presence. W-1 said that SOLOMON, TEETER, and other members of the Boogaloo Bois and Boojahideen openly discussed committing acts of violence in

_____

[4] I believe "pm" is an abbreviation for "private message."

[5] W-1 was later paid by the FBI for having provided information.

4

furtherance of the Boojahideen's stated goal of overthrowing the government and replacing its police forces. For example, SOLOMON and TEETER discussed attacking a National Guard Armory to steal weapons and "bombs" for the Boojahideen. W-1 stated that TEETER claimed to have a connection within the National Guard who would support the Boojahideen if a siege occurred. SOLOMON and TEETER also discussed seeking out and killing white supremacists. In reference to targeting members of a white supremacist organization for assassination, TEETER stated, "[INDIVIDUAL 1] will be recording when I kill them." In addition to discussing the theft of explosives from a National Guard Armory, SOLOMON asked W-1 if W-1 knew someone who could provide him with "C-4".[6]

12.   In early June, the FBI began receiving information about SOLOMON, TEETER, and other members of the Boogaloo Bois through a confidential human source (hereinafter "CHS").[7] The CHS initially met SOLOMON on Facebook. SOLOMON and the CHS communicated using Facebook's private messaging feature until SOLOMON instructed the CHS to switch to an encrypted messaging application. Since early June, the CHS has reported on numerous conversations with SOLOMON, TEETER, and members of the Boogaloo Bois, or the Boojahideen.

13.   On June 6 and into early June 7, the CHS, SOLOMON, TEETER, and an associate (INDIVIDUAL 2) met at a residence in the Twin Cities. During this audio-recorded[8] gathering,

_____

[6] Your affiant has consulted with an FBI expert on explosives. I have learned that C-4 is a military "high explosive" with no legitimate civilian use.

[7] The CHS is being paid by the FBI for information in this investigation. The CHS and W-1 do not know each other.

[8] FBI agents had provided the CHS with an audio-recording device.

the CHS, SOLOMON, TEETER, and INDIVIDUAL 2 discussed the Boojahideen's dislike of
police officers and the possibility of shooting members of law enforcement. At one point during
this conversation, SOLOMON, TEETER, and INDIVIDUAL 2 were all loading ammunition into
magazines while wearing gloves when TEETER stated, "[t]his isn't something I'm worried about
for a 'carry gun.'" Your affiant understands this to mean that TEETER is ordinarily unconcerned
about leaving fingerprints on a firearm or ammunition that he intends to carry legally.  TEETER
then stated, "[t]his is mercenary protocol…If I have to shoot someone I'm not going to call the
cops and stick around." SOLOMON responded, "[i]f you're carrying for self-defense you're going
to call the cops and go through the process." SOLOMON then added, "most likely, shit we're
doing we don't want our fingerprints on our shit."  In discussing a potential confrontation with
police, SOLOMON stated, "[i]f we get to the point where we engage the police, [UI]. I'm not
going to stop...I'm going to take out whoever initiated the violence, and then I'm going to hang
out in the area, you know, move and set up in a better location that's as close to the area as I can,
and then I'm going to take out the next thing that shows up. And I'm going to keep going until I'm
not taking out people anymore. Like if I get into a firefight, I'm getting into a firefight until I can't
fight anymore. If I run out of ammo, I'll go to court."

14.     On June 8, SOLOMON posted publicly the following on one of his two known
Facebook accounts (SOLOMON is in the center wearing blue mask and TEETER is standing to
SOLOMON's left):



On June 10, SOLOMON posted the following on Facebook:



7

The English translation of the Latin phrase "SI VIS PACEM, PARA BELLUM" (in the photograph's caption) is "if you want peace, prepare for war."[9]

15.     Based on recorded conversations between SOLOMON, TEETER, and the CHS that your affiant has reviewed, I know that SOLOMON and TEETER believe the CHS to be a member of Hamas, a designated foreign terrorist organization. The CHS is a middle-eastern male with a heavy accent. Based on several conversations with the CHS, SOLOMON and TEETER have expressed that the terrorist organization Hamas shares anti-U.S. government views that align with their own anti-U.S. government views. SOLOMON and TEETER expressed a desire to employ themselves as "mercenaries" for Hamas as a means to generate cash for the Boogaloo Bois/Boojahideen movement. SOLOMON and TEETER discussed with the CHS their need for funds to recruit members and for the purchase of land for a compound to train Boogaloo Bois and Boojahideen members.

16.     During a recorded June 14 meeting, the CHS asked TEETER to describe what he and the Boojahideen were planning to do for Hamas. During this conversation, the CHS emphasized that both TEETER and SOLOMON[10] could walk away from any plan they came up with and they could still be friends. TEETER replied that he and SOLOMON had long-term goals but lacked short-term goals and wanted to talk more with SOLOMON about ideas. When the CHS asked TEETER to "think out loud," TEETER stated that the Boojahideen could "make a statement" by destroying [government] monuments. The CHS told TEETER that his organization (Hamas) could support TEETER and SOLOMON's efforts to make the government look "weak".

_____

[9] *See* https://merriam-webster.com/dictionary/si vis pacem, para bellum.

[10] SOLOMON was not present at this June 14 meeting.

TEETER replied, "but just to make sure, C-4 falls within...[*TEETER'S voice trailed off and becomes momentarily inaudible on the recording*]?" The CHS affirmed that his organization was capable of that kind of support then stated, "you asked for C-4...what is it you can do in terms of a big statement?" TEETER explained that he and SOLOMON have backgrounds in construction and that "[o]ne big benefit of that being we understand how things work mechanically which means if we want to demolish a structure, or a monument, or a statute [sic], some kind of statement item...It's a thing I think we can do pretty easy. I don't have a huge background in plastic explosives but that's the easiest way to do it. The most controlled way so you don't hurt any bystanders. Thus, when people look at it they say we need to be able to say it was a strike against the government and no innocent people were hurt." When the CHS told TEETER they could work together, TEETER replied, "I would love to do that. I cannot tell you how much I would love to do that."

17.    On June 18, the CHS met with TEETER. In this recorded conversation, TEETER revealed that he and SOLOMON had decided to target a "historical county courthouse" because it was "a symbol of the unjust laws that America upholds" and had "low security." When the CHS expressed concern that blowing up a courthouse would be complicated, TEETER replied "[r]ight. Basic wiring, yeah. I understand the basics of that. So I used to, grew up on a farm, I've wired full buildings from the time I was fourteen, fifteen." TEETER told the CHS that he had been conducting internet research for this plan on the "dark web" where, he explained, "I have access to diagrams and explanations...." TEETER said he was researching the use of dynamite with an electric charge on a timer and that he wants to become an expert before doing it, but considers himself a "quick study."

18.     TEETER said that people would "take notice" if he "took out" a historical site that was "soft". He went on to say, "[b]ut still, but I'm not in a position where I can start hitting hard targets that like...what I would describe as hard targets which is a big reward yet, but once ...we start working together, and I show some of my other guys that this is stuff that we have...we have people willing to work with us, and that this is a thing we can accomplish, then I can start...doing the things that would allow me to hit hard targets." TEETER stated he wanted to conduct the attack at night so as not to hurt anyone. TEETER then identified a specific historical courthouse in northern Minnesota. The CHS asked him if he was positive he wanted to do this, to which TEETER replied "yes."

19.     On June 19, SOLOMON and TEETER met with the CHS to discuss the plot to destroy a specific county courthouse located in northern Minnesota. This meeting was recorded. In TEETER's presence, SOLOMON confirmed for the CHS that SOLOMON and TEETER were working on the courthouse destruction plot together: "we're kind of the same entity, right?...Like if he's not here right I think you can agree that I can speak for you. If I'm not there, he can speak...We're on the same page." SOLOMON also explained to the CHS how he and TEETER would be an asset to Hamas: "to you and your friends, we've got to be pretty valuable because two American-born white boys, right? We can move around like nothing. I can take anything anywhere." SOLOMON then asked for "an investment into our future." TEETER stated "I'm set up. I'm working on calculating the exact amounts, the explosives and stuff I need for that. I'm ready to go." When asked about the cost for the courthouse plot, TEETER replied, "I can run the numbers on the explosives as far as stick weight to detonation pretty quickly. I should be able to pull up the schematics on the courthouse pretty easy and figure out the exact science." When discussing future targets for the Boogaloo Bois, SOLOMON said, "[a]s soon as we, you know,

mark the politicians that we want to. I'd be fine with going after the media after that. I'm not necessarily talking about the journalists on the street. Yeah, they lie. I'm more talking, I just want to take out the top 20% people at each company."

20.     On June 28, SOLOMON, TEETER, and the CHS met at a hotel. There, the CHS introduced SOLOMON and TEETER to an individual who SOLOMON and TEETER believed was another, more senior, member of Hamas.[11] This individual is, in fact, an undercover employee (UCE) of the FBI. During this audio and video recorded meeting, SOLOMON and TEETER expressed their willingness to the UCE to manufacture suppressors[12] for Hamas.[13]

21.     During this meeting, TEETER explained his philosophy to the UCE. TEETER stated he was an "anarchist" who wants to "completely remove the government, then just start over." SOLOMON added, "our goal is to tear it down." When asked how long TEETER and SOLOMON had been part of the movement, TEETER replied "for about a year and a half, which is when we both got into it…." In an effort to convince the UCE that they would have value to Hamas, SOLOMON stated, "I'm also a redneck, nobody notices a redneck. But basically like, we've, we've got the ideas, we've got you know, what we wanna do, we've got training and we've

---

[11] The CHS had previously characterized this individual to SOLOMON and TEETER as the person within Hamas to whom the CHS reports.

[12] I know that a suppressor is a device affixed to the barrel of a firearm that is designed to suppress both the sound and light emitted from the firearm when it is discharged. These devices are regulated by federal law. *See* Title 26, United States Code, § 5861(d)(making it unlawful for any person to receive or possess a firearm, the definition of which includes a silencer or suppressor, that is not registered to him in the National Firearms Registration and Transfer Record). *See also* Title 26 U.S.C. § 5845(a) and Title 18 U.S.C. § 921(a)(3)(C).

[13] At SOLOMON and TEETER's request, the CHS gave them funds to purchase a drill press necessary to manufacture the suppressors.

got knowledge…". TEETER added, "and we have a network." TEETER further explained that he had the knowledge and experience necessary "to manufacture unmarked parts for guns and create unregistered and untraceable weapons as well." TEETER stated, "[w]ith about $700 dollars of equipment I can produce…unmarked and untraceable AR-15s."[14]   SOLOMON added, "[y]eah,…we can also make 'em fully automatic if you'd like."   In reference to manufacturing untraceable AR-15s, TEETER explained that "we have ah, Boog Boys across the country who we could use as a network to move it around,…it's definitely something we'd be capable of." When asked by the UCE what Hamas could in turn do for the defendants, TEETER replied "we just…do not have the funding to start to do a lot of these things…."   TEETER and SOLOMON then discussed their plan to raid the headquarters of a white supremacist organization in North Carolina, stating "if we can, make it so twenty, forty of them can't go home…it's a win-win."  Later in this meeting, the men discussed their mutual goals.  SOLOMON stated "if we are able to accomplish our goals, the U.S. would be fucking done." Asked about future specific goals, TEETER stated, "I believe that I could completely demolish [the historic courthouse] with about twelve pounds of dynamite and fifteen mini-fuses."   SOLOMON added, "here's something that's a lot better than dynamite, C4 is a lot more powerful."

22.     During the meeting with the CHS and the UCE, the defendants discussed "soft" and "hard" targets. Asked to identify a "hard" target, SOLOMON responded, "I would love to take out a police station" and referenced using a grenade launcher to accomplish this. As a "first step" in building trust with Hamas, SOLOMON suggested giving the UCE "something that we produce."  TEETER explained the attack on the headquarters: "we want to go in with subsonic

---

[14] Your affiant knows that an "AR-15" is a lightweight semi-automatic rifle.

ammunition, ah, and we want to go in suppressed. And I, I can, I can get us subsonic ammunition and suppressors, that's [UI], those are both things that I can provide for us if, if I can find them." When asked by the UCE if TEETER knew how to build a suppressor, SOLOMON stated, "Yes. We both know how to do that."

23.     The UCE asked about SOLOMON's reference to politicians.   TEETER replied "that would be a future thing."  SOLOMON stated, "[w]ell, for the future, I'd build a gallows in front of the...in front of the Congress building in D.C. and just start hanging politicians left and right."   In reference to politicians hiring security for protection, TEETER stated, "you can't stop threats that you can't see. I shoot precision long-range bolt rifles. I, I do most of my shooting beyond half a mile. And I can easily, with a well-equipped rifle, shoot to fifteen hundred yards."

24.     On July 6, at SOLOMON and TEETER's request, the CHS provided TEETER with funds for the purchase of the tools and parts needed to produce the suppressors. At 5:30 p.m. on July 9, TEETER communicated with the CHS via a secure messaging application about also building pistols for the CHS: "I can't remember if I mentioned this before, but I can also build pistols. The Sig Sauer P320 is modular, which means with a jig and a parts kit I can drill and build them." In reference to the suppressors they previously agreed to build for Hamas, TEETER texted the following: "I'm excited to see my products in action."  Approximately 45 minutes later, SOLOMON and TEETER purchased a drill press at a Maple Grove hardware store and were observed loading the drill press into the bed of SOLOMON's red pick-up truck. This drill press has been kept at SOLOMON's home since.

25.     On July 16, SOLOMON and TEETER informed the CHS that they had successfully manufactured five functional suppressors and showed the devices to the CHS while in SOLOMON's home. During this recorded meeting, SOLOMON and TEETER proposed using

explosives to destroy a different historic courthouse located in the Twin Cities area. Further, SOLOMON and TEETER again proposed converting semi-automatic rifles into fully-automatic firearms for the benefit of Hamas. The following day, July 17, the CHS informed TEETER in a recorded conversation that the suppressors would specifically be delivered to the militant wing of Hamas.

26.     On July 30, SOLOMON and TEETER delivered the five suppressors to the UCE[15] at which time both SOLOMON and TEETER expressed their desire to manufacture additional suppressors and fully-automatic weapons for Hamas. During this meeting, SOLOMON and TEETER explained that they were delaying the plot to demolish a courthouse so they could continue to build their relationship with Hamas, which would include the manufacture of the additional suppressors.

27.     On August 5, TEETER and the CHS discussed on a secure messaging application the suppressors he and SOLOMON had supplied. In this exchange, the CHS told TEETER that he was eager for the suppressors to be delivered to his organization and to be put to use. TEETER replied: "I hope between this and my people's work here we can turn the tide for you."

28.     On August 12, in a recorded conversation SOLOMON and TEETER further described for the CHS their reasons for delaying the plot to blow up a historic courthouse. SOLOMON and TEETER stated they did not want to simply blow up a historic courthouse but rather, preferred to execute a larger plot when the Boogaloo Bois are better positioned to fulfill

---

[15] The FBI retained possession of the suppressors and submitted the devices to an FBI firearms expert for testing. The expert concluded that the devices functioned consistent with silencers purchased from licensed U.S. manufacturers.

their goals.  As an example of a larger plot, SOLOMON and TEETER discussed the murder of
politicians:

> SOLOMON: Here's the thing.  If and when we make a statement right.  I don't
> want to blow up some fucking bullshit courthouse in the middle of
> nowhere Minnesota.
>
> TEETER: That's why I picked a different one.  I picked a really famous one.
>
> CHS: Oh my god
>
> SOLOMON: Here's the thing.  I want to like take down twenty senators while
> they're playing fucking baseball, right?
>
> TEETER: That is a better idea, that is a much better idea.
>
> CHS: Oh my god.  Twenty what?
>
> TEETER and SOLOMON:  (OV) Senators.
>
> TEETER: Like U.S. Senators.
>
> SOLOMON: I don't want to blow up a courthouse.  I want to murder a bunch of
> U.S. politicians.   That's the statement I want to make.
>
> CHS: That's a statement for real.
>
> SOLOMON: Exactly.
>
> TEETER: I mean, people have definitely shot some before.[16]  If anyone can
> get a shot off at them means we could easily take out the rest of
> them.
>
> SOLOMON: Yeah.

---

[16] This idea appears to be in reference to the June 14, 2017, shooting during a softball practice for
Republican congressmen at Eugene Simpson Stadium Park in Alexandria, Virginia. The shooting
resulted in injuries to several victims, including a United States Congressman, and the death of the
gunman.

29.     On August 20, the UCE showed SOLOMON and TEETER a video of purported members of Hamas[17] firing rifles equipped with the suppressors manufactured by SOLOMON and TEETER.  Upon viewing the video of their suppressors in use, both SOLOMON and TEETER reacted positively.   Both SOLOMON and TEETER then immediately  proceeded to negotiate a price for an additional  five suppressors. As SOLOMON and TEETER discussed pricing for the additional  suppressors with the UCE, SOLOMON told the UCE that his organization  would get a "steep discount" of fifty percent on future suppressors. The UCE told SOLOMON and TEETER that these additional  suppressors  would  be used overseas to attack Israeli and the U.S forces training  with them.  SOLOMON and TEETER agreed to build  them quickly  and agreed on a price of $1800 for the five additional  suppressors.  Later in this recorded conversation,  SOLOMON and TEETER proposed creating a store front where they could build  suppressors and rifles in the back while maintaining  a legitimate-appearing  maintenance  business.  In return for a loan from Hamas to start this business, SOLOMON and TEETER reiterated the idea of giving  Hamas a discount on suppressors and rifles.

30.     On August 29, TEETER and SOLOMON met the UCE and CHS at a hotel room. This meeting was audio and video recorded.  TEETER and SOLOMON told the UCE and CHS that the parts needed for the suppressors had not arrived and therefore were not ready for delivery. TEETER and SOLOMON expressed disappointment  in themselves that they failed to deliver the additional  suppressors on time.

_____

[17] The individuals  depicted in the video were employees of the FBI.

16

31.     At this same meeting, SOLOMON and TEETER did deliver a "drop in auto sear" (hereinafter "DIAS")[18] to the UCE and CHS. Your affiant knows that a DIAS is a part designed and intended for use in converting a weapon to shoot automatically by a single pull of the trigger. SOLOMON told the UCE and CHS that he tested the functionality of the DIAS earlier and that it appeared to function properly on his own rifle. SOLOMON and TEETER assured the UCE that the user could get hundreds of rounds shot out of the DIAS. TEETER recommended, "I would say use one for the first time for combat and then just for training maybe after that until you know how long they last." The UCE stated it would be sufficient if the DIAS worked long enough to kill a few American and Israeli soldiers, to which SOLOMON replied, "yeah."

32.     The UCE asked SOLOMON to demonstrate how to insert the DIAS into a rifle that the UCE had in his possession. SOLOMON did so but noted that this DIAS appeared to be too large for the UCE's rifle. SOLOMON stated he could order a smaller version because his supplier was creating them with a 3-D printer and could change the dimensions of the DIAS for him. When the CHS asked SOLOMON and TEETER if the manufacturer of the DIAS tests the fit of the DIAS in a weapon, SOLOMON stated, "yeah but that's technically super illegal…." Further, in regard to manufacturer of the parts used to make the suppressors, TEETER stated, "if they knew what we were doing with them they'd report us to the FBI."

_____

[18] Under Title 26, United States Code § 5845(b), the definition of "machine gun" includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun." These devices are regulated by federal law. *See* Title 18, United States Code § 922(o)(prohibiting possessing or transferring machine guns).

## CONCLUSION

33.     Based on the information described above, I respectfully submit there is probable cause to believe that MICHAEL ROBERT SOLOMON and BENJAMIN RYAN TEETER, in the District of Minnesota and elsewhere, conspired and attempted to provide material support and resources to a designated foreign terrorist organization, in violation of Title 18, United States Code, § 2339B.

## REQUEST FOR SEALING

34.     I further request that Court seal the underlying affidavit supporting the criminal complaint until further order of the Court. My supporting affidavit details matters about the investigation that are not a matter of public information. The FBI is continuing to investigate active leads concerning the defendant'' ties to others. Accordingly, clear and convincing reasons to seal the affidavit because the premature disclosure of this investigation will jeopardize the FBI's efforts to pursue active leads in this investigation and the ongoing investigation.


        Further your Affiant sayeth not.


                                                Thomas E. Wilberg
                                                Special Agent
                                                Federal Bureau of Investigation


SUBSCRIBED and SWORN before me
by reliable electronic means (FaceTime and
email) pursuant to Fed. R. Crim. P. 41(d)(3) on
September 3, 2020:


The Honorable Tony N. Leung

18

United States Magistrate Judge